IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| RUBMARIE VALENTIN LUGO; HERNAN OTERO AND THEIR LEGAL CONJUGAL PARTNERSHIP,<br><br>Plaintiffs<br><br>v.<br><br>HOSPITAL MATILDE BRENES INC., D/B/A DOCTORS' CENTER HOSPITAL BAYAMON; CONTINENTAL INSURANCE COMPANY; DR. HECTOR RIVERA RIVERA; MARY DOE AND THEIR LEGAL CONJUGAL PARTNERSHIP; EFG INSURANCE COMPANY; EMERGENCIOLOGOS PARA PUERTO RICO PSC; XYZ INSURANCE CO.; DR. ANGEL TORRES SANCHEZ; JANE DOE AND THEIR LEGAL CONJUGAL PARTNERSHIP; MNO INSURANCE COMPANY,<br><br>Defendants | CIVIL 12-1757 (PAD) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

On December 18, 2013, plaintiffs Rubmarie Valentín Lugo, Hernán Otero and their Legal Conjugal Partnership filed a third amended complaint alleging violations under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §§ 1395dd et seq. and articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142, against defendants Hospital Matilde Brenes, Inc. D/B/A Doctors' Center Hospital Bayamón, Dr. Hector

CIVIL NO. 12-1757 PAD                    2

Rivera Rivera, Dr. Ángel Torres Sánchez, Emergenciólogos para Puerto Rico PSC, their respective insurance companies and any other party that might potentially be responsible for the injuries suffered. (See Docket Nos. 1, 16, 20, 49). Defendants answered the complaint and amended complaints, including the third amended complaint, denying the existence of an EMTALA violation since the transfer to another hospital at issue was conducted per patient's request (Docket Nos. 10, p. 1, ¶2[1], 51 at 4, 61-1, p. 2[2], ¶2, Docket No. 80, p. 8[3]) after it was determined by an examining doctor that she was stable. (Docket No. 10, p. 1, ¶2). They also claimed that the treatment provided was the appropriate one based on the physician's diagnostic impressions. (Docket No. 12, pp. 3-4, ¶13 and 26).

Defendants moved for Summary Judgment (Docket No. 61) based on a lack of genuine issues of material fact as shown by the evidence presented and on the absence of a genuine dispute under the substantive law relevant to the case. (Docket No. 61, p. 4).

Plaintiffs responded in opposition to the Motion for Summary Judgment (Docket No. 66) by claiming that there are sufficient genuine issues of material

---

[1] Docket No. 10 Answer to Complaint by Defendant Doctors' Center Hospital Bayamón.

[2] Docket No. 61-A Defendants' Statement of Uncontested Facts.

[3] Docket No. 80 Reply to Response in Opposition to Motion for Summary Judgment.

CIVIL NO. 12-1757 PAD                              3

fact that preclude summary disposition (Docket No. 66, p. 2, ¶2) regarding the appropriate screening exam available within the hospital's capabilities (Docket No. 66, p. 2, ¶4), the patient's stabilization prior to her transfer (Docket No. 66, p. 3, ¶7) and the validity of the certifying document. (Docket No. 66, p. 3, ¶9).

In the reply to the plaintiffs' response in opposition to the Motion for Summary Judgment (Docket No. 80) defendants claimed that the test required by EMTALA is for appropriate treatment based on what the physicians perceived the condition to be and not what the adequate treatment should have been, which would turn the claim under EMTALA into a malpractice federal claim. (Docket No. 80, p. 6).

Having considered the opposing statements of the parties and their arguments, I recommend that the court enter the following

## II.  FINDINGS OF FACT

1. On December 27, 2011, plaintiff Rubmarie Valentín developed sudden onset abdominal and pelvic pain during her lunch break at Doctors' Center Hospital Bayamón where she worked, and was transferred to the Doctors' Center Hospital Bayamón's Emergency Room. (Docket No. 49, p.5, ¶12-13).

2. Defendants claim that plaintiff Rubmarie Valentín was first taken to the Labor Room where she refused to be examined by the resident obstetrician Dr. Hernández, preferring to be treated by her personal obstetrician in Manatí.

CIVIL NO. 12-1757 PAD                    4

(Docket No. 51, p. 2, ¶1; p. 6, ¶27).  In the Emergency Room, a Non-Stress Test[4] was performed that indicated a normal fetal heart rate[5] and showed no evidence of contractions[6].  (Docket no. 51, p. 3, ¶13).

    3. Plaintiffs claim that the Non-Stress Test did show a wave that could have been a uterine contraction, (Docket No. 67, p. 2, ¶ 3) but that the test performed was not complete enough to provide for an appropriate screening.  (Docket No. 67, p. 3, ¶11).

    4. A pelvic examination[7] further revealed that plaintiff Rubmarie Valentín had not dilated[8]. (Docket no. 51, p. 4, ¶15).  Both examinations were performed by Dr. Ángel Torres Sánchez (Docket no. 51, p. 4, ¶16) in an attempt to identify

---

[4]"The monitoring of the response of the fetal heart rate to fetal movements by cardiotocography; a reactive (normal) test consists of two or more fetal movements occurring within 20 minutes accompanied by acceleration of the fetal heart rate by at least 15 beats per minute for at least 15 seconds with a long-term variability of at least 10 beats per minute."  *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012) ("*Dorland's*"), at 1895.

[5]"The number of contractions of the ventricles of the heart per unit of time (usually a minute)."  *Dorland's* at 1595.

[6]"A reduction in size or shrinkage of the uterus, as in menstruation or labor."  *Dorland's* at 409-10.

[7]"Inspection, palpation, auscultation, percussion, or other means of investigation, specially for diagnosing disease… of the interior portion of the trunk of the body, bounded anteriorly and laterally by the two hip bones and posteriorly by the sacrum and coccyx."  *Dorland's* at 656 and 1403.

[8]"To stretch an opening or hollow structure beyond its normal dimensions."  *Dorland's* at 520.

CIVIL NO. 12-1757 PAD                5

a critical medical condition, according to the symptoms plaintiff Rubmarie Valentín presented and the level of screening applied to all patients with similar complaints. (Docket no. 80, p. 5).

5. Plaintiff Rubmarie Valentín's vital signs[9] and Dr. Hector Rivera Rivera's diagnostic impression of back pain[10], pelvic pain and renal colic[11] were obtained and recorded after which a CBC[12], a U/A[13], a PT[14], a PTT[15], a CMP[16], and a renal

---

[9] "The pulse, respiration and (body) temperature." *Dorland's* at 1716.

[10] "A more or less localized sensation of discomfort, distress, or agony, resulting from the stimulation of specialized nerve endings. It serves as a protective mechanism insofar as it induces the sufferer to remove or withdraw from the source." *Dorland's* at 1363.

[11] "Pain produced by thrombosis or dissection of the renal (kidney) artery, renal infraction, intrarenal mass lesions, the passage of a stone within the collecting system, or thrombosis of the renal vein." *Dorland's* at 383.

[12] "Complete blood count." *Dorland's* at 310.

[13] "Urinalysis; physical, chemical, or microscopic analysis or examination of urine." *Dorland's* at 2009.

[14] "Prothrombin time; the stage at which prothrombin is converted to thrombin in citrated blood with added calcium; used to assess the extrinsic pathway to coagulation. Results indicate the integrity of the prothrombin complex [...] and the test is often used to monitor administration of coumarin-type anticoagulants." *Dorland's* at 1550 and 1928.

[15] "Partial thromboplastin; a measure of coagulation factors of the intrinsic pathway of coagulation in plasm; now largely superseded by the test of activated partial thromboplastin t." *Dorland's* at 1928.

[16] "Cytidine monophosphate; a nucleotide, the 5'-pyrophosphate of cytidine that serves as a carrier for N-acetylneuraminic acid in glycoprotein synthesis."

CIVIL NO. 12-1757 PAD            6

sonogram[17] were ordered. (Docket no. 49, p. 5, ¶ 13; Docket no. 51, p. 1-2, ¶1; Docket no. 52, p. 3, ¶13).

    6. Since plaintiff had a prior history of renal stones[18], she was tested to determine whether they were the source of the pain (Docket no. 61, pp. 17-18), without considering her pregnancy since there were no apparent contractions and she appeared to be stable. (Docket no. 61, p. 19).

    7. At plaintiff's own request, the hospital started an arrangement for her transfer to Doctors' Center Hospital in Manatí, where her OB/GYN, Dr. Jorge Otero Quintana, was available to treat her. (Docket no. 49, p. 5, ¶16; Docket no. 51, p. 2, ¶1). Dr. Angel Torres Sánchez drafted a detailed certification of transfer, which was supposedly signed by plaintiff Rubmarie Valentín. (Docket no. 51, p. 4, ¶16)[19].

    8. Defendants claim that at the time the ambulance left the hospital plaintiff Rubmarie Valentín's vital signs were normal (Docket No. 51, p. 4, ¶16), while plaintiffs claim that according to the paramedic record she was having premature

---

*Dorland's at* 376 and 464.

[17]"A record or display obtained by ultrasonic scanning (of the kidney)." *Dorland's* at 1735.

[18]"Kidney calculus; an abnormal concretion in the body, usually composed of mineral salts." *Dorland's* at 1777 and 271.

[19]Plaintiff claims that she does not recognize the signature found in the document. (Docket No. 66, pp. 3, ¶ 8-9).

CIVIL NO. 12-1757 PAD                   7

contractions and that her pulse indicated the possibility of hypovolemic shock[20] and class II hemorrhage[21]. (Docket no. 66, p. 5, ¶ 14; Docket no. 66-1, p. 5).

9. Upon arriving at Doctors' Center Hospital in Manatí, the receiving nurse recorded there was no fetal heart rate and that the patient was having contractions; as well as being pale, diaphoretic[22] and restless. (Docket no. 49, p. 6, ¶18).

10. The physical examination performed in the Emergency Room revealed she had tachycardia[23] without respiratory distress[24], her abdomen as being gravid[25] with tenderness[26] to palpation and an inability to detect the fetal heart

---

[20]"A condition of profound hemodynamic and metabolic disturbance characterized by failure of the circulatory system to maintain adequate perfusion of vital organs[,] result[ing] from inadequate blood volume[...]" *Dorland's* at 1703.

[21]"The escape of blood from the vessels; bleeding." *Dorland's* at 842.

[22]"Pertaining to, characterized by, or promoting sweating." *Dorland's* at 509.

[23]"Excessive rapidity in the action of the heart; the term is usually applied to a heart rate above 100 beats per minute in an adult and is often qualified by the locus of origin as well as by whether it is paroxysmal or nonparoxysmal." *Dorland's* at 1867.

[24]"Fulminant pulmonary interstitial and alveolar adema, which usually develops within a few days after an initiating trauma; it is thought to result from alveolar injury that has led to increased capillary permeability." *Dorland's* at 1820.

[25]"Pregnant; the pregnant uterus." *Dorland's* at 805 and 2013.

[26]"Abnormal sensitiveness to touch or pressure." *Dorland's* at 1881.

CIVIL NO. 12-1757 PAD                 8

rate frequency.  (Docket no. 49, p. 6, ¶19).

11.  An emergency exploratory laparatomy[27] performed by her OB/GYN revealed a ruptured uterus[28] caused by a previous cesarean section[29] scar[30], and intra-uterus death fetus[31]. (Docket no. 49, p. 7, ¶ 20-21, Docket no. 51, p. 5, ¶20).

12.  Plaintiff had to be transferred to the intensive care unit and developed further complications while hospitalized. (Docket No. 49, p. 7, ¶22).  Upon being released on January 3, 2012 she became aware of further neurologic[32] deficits in her senses of taste and smell.  (Docket No. 49, p. 7, ¶23 and 25).

Based upon the above proposed findings of fact, I recommend that the court enter the following

---

[27]"Surgery for diagnostic purposes, into the abdominal cavity." *Dorland's* at 661 (for *exploratory*) and at 1005 (for *laparotomy*).

[28]"Forcible tearing or disruption of [the uterus]; the hollow muscular organ in female mammals in which the blastocyst normally becomes embedded and in which the developing embryo and fetus is nourished." *Dorland's* at 1659 (for *rupture)* and at 2013 (for *uterus).*

[29]"Incision through the abdominal and uterine walls for delivery of a fetus." *Dorland's* at 1685.

[30]"A mark remaining after the healing of a wound or other morbid process." *Dorland's* at 1674.

[31]"Death in utero; failure of the product of conception to show evidence of respiration, heartbeat, or definite movement of a voluntary muscle after expulsion from the uterus, with no possibility of resuscitation." *Dorland's* at 473.

[32]"Deals with the nervous system." *Dorland's* at 1266.

CIVIL NO. 12-1757 PAD                    9

### III. CONCLUSIONS OF LAW

1. Defendants moved for summary judgment under Rules 7.1(a), 7.1(d), 7.1(e) and 56(a) of the Local Rules of the United States District Court for the District Court of Puerto Rico. "Under Federal Rule of Civil Procedure 56(a), '[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Nunes v. Massachusetts Dep't. of Correction, 766 F.3d 136, 142 (1st Cir. 2014); see Celotex Corp. V. Catrett, 477 U.S. 317, 323, 1056 S. Ct. 2548 (2000); Cruz-Gascot v. HIMA-San Pablo Hosp. Bayamon, 728 F. Supp. 2d 14, 18 (D.P.R. 2010).

2. "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law. Newman v. Advanced Tech. Innovation Corp., 749 F.3d 33, 36 (1st Cir. 2014) (quoting One Nat'l Bank v. Antonellis, 80 F.3d 606, 608 (1st Cir. 1996))." García-González v. Puig-Morales, 761 F.3d 81, 87 (1st Cir. 2014). "Summary judgment is inappropriate if the evidence 'is sufficiently openended to permit a rational fact finder to resolve the issue in favor of either side.' Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013)." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).

3. The Emergency Medical Treatment and Active Labor Act, also known as EMTALA, was enacted by Congress "to prevent the unsavory practice known as patient 'dumping', whereby hospitals precipitously discharged or transferred to

CIVIL NO. 12-1757 PAD          10

other hospitals patients who were unable to pay for their healthcare, in many cases even before the hospital determined whether the patient had a critical medical condition which was likely to deteriorate after discharge or during the inter-hospital transfer. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1189-90 (1st Cir. 1995)." Fraticelli-Torres v. Hospital Hermanos, 300 Fed. Appx. 1, 3 (1st Cir. 2008); cf. Kenyon v. Hospital San Antonio, Inc., 951 F. Supp. 2d 255, 262 (D.P.R. 2013).

    4. "To establish an EMTALA violation, a plaintiff must show (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency condition, or (b) released the patient without first stabilizing the emergency medical condition. Correa [v. Hosp. San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995)]." Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 63, 68-69 (1st Cir. 2013); Maldonado-Rodriguez v. St. Luke's Memorial Hosp., Inc., 940 F. Supp. 2d 30, 35 (D.P.R. 2013); Matta-Rodriguez v. Ashford Presbyterian Community Hosp., 2014 WL 3592087 at *4 (D.P.R. July 18, 2014).

    5. The EMTALA statute itself does not define what an appropriate medical screening or examination consists of but our Court of Appeals has

> ". . .defined a participating hospital's duty as providing an examination 'reasonably calculated to identify critical medical

CIVIL NO. 12-1757 PAD                11

> conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. The essence of this requirement is that there be some screening procedure and that it be administered even-handedly.' [Correa v. Hosp. San Francisco, 69 F.3d] at 1192. [...]. '[A] refusal to follow regular screening procedures in a particular instance contravenes the statute, but a faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.' Id. at 1192-93. [...] '[W]hen a hospital prescribes internal procedures for a screening examination, those internal procedures 'set the parameters for an appropriate screening.' Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R., 417 F. 3d 67, 70 (1st Cir. 2005) (quoting Correa [v. Hosp. San Francisco], 69 F.3d at 1192". Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 717 F.3d at 69.

6. Therefore, the minimum standard required by EMTALA is that which falls within the hospital's capabilities, followed in the screening and treatment of patients presenting similar symptoms. See Vázquez-Rivera v. Hosp. Episcopal San Lucas, Inc., 620 F. Supp. 2d 264, 269 (D.P.R. 2009); Rivera v. Hospital Episcopal Cristo Redentor, 613 F. Supp. 2d 192, 198-99 (D.P.R. 2009).

7. Since EMTALA does not take the place of a malpractice cause of action, the question is not whether the hospital should have known about an emergency medical condition, but whether it knew about it and refused to provide the appropriate treatment or care.  "Any time an unstabilized patient did not receive the correct care prior to transfer, he could sue in federal court. This is entirely inconsistent with our jurisprudence and Congressional intent, as we have previously stated 'EMTALA' does not create a cause of action for medical

CIVIL NO. 12-1757 PAD                12

malpractice.' Correa, 69 F.3d at 1192." Ramos-Cruz v. Centro Médico del Turabo, 642 F.3d 17, 19 (1st Cir. 2011); see Rosado-Gonzalez v. Alejandro Otero Lopez Hosp., 836 F. Supp. 2d 48, 56 (D.P.R. 2011); Matta-Rodriguez v. Ashford Presbyterian Community Hosp., 2014 WL 3592087 at *3.

    8.   Defendants claim that based on the location of patient's pain, her medical record and previous history of renal stones, they were under the impression that her condition had nothing to do with the pregnancy and decided to treat Mrs. Valentín as any other patient with the same symptoms. (Docket No. 80, p. 6).  No protocol existed for a pregnant patient with the same complaint. (Docket No. 80, p. 5). "'EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment; it is not implicated whenever individuals who turn out in fact to have had the same condition receive disparate treatment.' [Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 144 (4th Cir. 1996)]". Cruz-Vázquez v. Mennonite Gen. Hosp., Inc., 717 F.3d at 71; see Colon-Ramos v. Clinica Santa Rosa, Inc., 938 F. Supp. 2d 222, 225 (D.P.R. 2013); cf. Matta-Rodriguez v. Ashford Presbyterian Community Hosp., 2014 WL 3592087 at *7.

    9.   In compliance with EMTALA requirements, tests were ordered  in an attempt to identify the source of her pain. (Docket No. 49, p. 5, ¶ 13; Docket No. 51, p. 1-2, ¶1; Docket No. 52, p. 3, ¶13). Plaintiff was subsequently transferred to a hospital in her hometown where her doctor was available to treat her, after

CIVIL NO. 12-1757 PAD                13

being certified by a doctor that she was stable enough to make the journey. (Docket No. 49, p. 5, ¶16; Docket No. 51, p. 2, ¶1; Docket No. 49, p. 7, ¶22). Whether or not that impression was correct is not a question covered by EMTALA. See Alvarez-Torres v. Ryder Memorial Hosp., Inc., 582 F.3d 47, 52 (1st Cir. 2009).

## IV. RECOMMENDATION

For the reasons stated above, I recommend the court grant the motion for summary judgment, and enter judgment in favor of defendants and against plaintiffs for lack of subject matter jurisdiction under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. §§ 1395dd et seq.[33]

"As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." López Mulero v. Vélez Colón, 490 F. Supp. 2d 214, 227 (D.P.R. 2007) (quoting Rodríguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)); see Ramos-Borges v. Puerto Rico, Puerto Rico Health Dept., 740 F. Supp. 2d 262, 279-80 (D.P.R. 2010); Rodríguez-Rivas v. Police Dep't of P.R., 483 F. Supp. 2d 137, 139-40 (D.P.R. 2007). Should the court adopt the report and

---

[33] Marielia Isla Torres, a third-year student at University of Puerto Rico School of Law, provided substantial assistance in researching and preparing this report and recommendation.

CIVIL NO. 12-1757 PAD                         14

recommendation, I also recommend that plaintiffs' state-law claims be dismissed without prejudice.

Under the provision of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within fourteen (14) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. Fed. R. Civ. P. 72 (b)(2); see Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466 (1985); United States v. DeJesus-Viera, 655 F.3d 52, 57 n.1 (1st Cir. 2011); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Velázquez v. Abbott Laboratories, 901 F. Supp. 2d 279, 288 (D.P.R. 2012).

In San Juan, Puerto Rico this 7th day of November, 2014.

                                   S/JUSTO ARENAS
                                   United States Magistrate Judge